UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

v.

WELLINGTON EUSTATE ESPINAL,
    a/k/a "Roni,"

                    Defendant.

---

S8 23 Cr. 501 (JPC)

<br>

## SENTENCING SUBMISSION OF THE UNITED STATES OF AMERICA

<br><br>

JAY CLAYTON
United States Attorney for the
Southern District of New York
26 Federal Plaza, 37th Floor
New York, New York 10278

<br><br>

Katherine Cheng
Maggie Lynaugh
Chelsea L. Scism
Adam Sowlati
Assistant United States Attorneys
    *Of Counsel*

**TABLE OF CONTENTS**

BACKGROUND ........................................................................................................................1

   I.    Offense Conduct Overview ..............................................................................1

          A.    The Enterprise Sold Illegal Pills Through Online Pharmacy Storefronts..............6

          B.    The Enterprise Manufactured Millions of Counterfeit Prescription Pills Using Deadly Narcotics ...................................................................................15

          C.    Shippers Mailed Counterfeit Prescription Pills to Victims Across the United States........................................................................................24

          D.    The Enterprise Used Manipulative Marketing to Keep Victims Coming Back ..................................................................................................30

          E.    Holly Holderbaum Was Killed by the Enterprise's Fentanyl Pills ......................35

   II.    Relative Culpability ........................................................................................38

   III.    Offense Conduct Specific to Wellington Eustate Espinal................................42

   ███    ████████████.....................................................................................48

   V.    Criminal History.............................................................................................49

   VI.    The Plea and Guidelines Calculation ..............................................................50

   VII.    Victim Impact.................................................................................................52

DISCUSSION .......................................................................................................................53

   I.    Applicable Law ..............................................................................................53

   II.    The Court Should Impose a Sentence of At Least 600 Months' Imprisonment ...............54

          A.    The Seriousness of the Offense and the Need to Provide Just Punishment Warrant a Significant Sentence...........................................................55

          B.    The Need for Specific Deterrence and to Promote Respect for the Law Warrants a Significant Sentence ..........................................................58

          C.    The Need for General Deterrence Warrants a Significant Sentence.....................59

          D.    A Significant Sentence Will Avoid Unwarranted Sentencing Disparities ..................................................................................................63

CONCLUSION......................................................................................................................69

The Government respectfully submits this memorandum in advance of the June 17, 2026 sentencing of the defendant, Wellington Eustate Espinal, a/k/a "Roni."  The defendant stands before this Court as one of the most culpable actors in this prolific narcotics conspiracy that resulted in the death of Holly Holderbaum.  For years, the defendant managed a massive pill mill in the Bronx, New York, flooding this country with millions of deadly pills containing fentanyl, methamphetamine, and other drugs.  He purposefully shaped, dyed, and stamped the pills to look like real pharmaceuticals.  When other members of this conspiracy were arrested, the defendant chose to keep operating his pill mill.  When he overdosed and almost died from manufacturing his poison pills, the defendant chose to keep making drugs that countless others might overdose from too. ██████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████  The defendant must be removed from society to reflect the seriousness of his conduct ██████████████████████ provide just punishment, promote respect for the law, afford adequate deterrence, and protect the public from this defendant's crimes.  For the reasons set forth below, the Government submits that a sentence of at least 600 months' imprisonment would be sufficient, but not greater than necessary, to achieve the legitimate purposes of sentencing.

## BACKGROUND

### I. Offense Conduct Overview

Online pharmacies promise American citizens cost savings and convenience.  In 2023, more than half of all Americans reported using an online pharmacy.  The United States Food and Drug Administration ("FDA") estimates that, at any given time, there are approximately 35,000 active online pharmacies.  (Dkt. 58 ("Indictment" or "Ind.") ¶ 1).  But according to the National

Association of Boards of Pharmacy, only approximately five percent of those websites comply with United States pharmacy laws and practice standards. (*Id*.).

The proliferation of unregulated online pharmacies has fueled the nation's fentanyl epidemic, enabling drug traffickers to peddle direct-to-consumer counterfeit pharmaceuticals, which are devoid of the medication they purport to contain and are instead comprised of deadly narcotics like fentanyl and its analogues. Fentanyl, a synthetic opioid fifty times more potent than heroin, and fifty to 200 times more potent than morphine, has killed Americans at an unprecedented rate and is the leading cause of death for Americans between the ages of 18 and 45. (*See* Ind. ¶ 2; Tr. 1667:17-20 (Jessica Smith)).[1] Just two milligrams of fentanyl, equal to approximately ten to fifteen grains of table salt—an amount so tiny that it could fit on the tip of a pencil—is enough to kill a human being. (Ind. ¶ 2).

For at least two and a half years, a network of individuals located in the United States, the Dominican Republic, India, and elsewhere (the "Enterprise") have exploited Americans' reliance on online pharmacies by advertising, selling, manufacturing, and shipping through the mail millions of unregulated counterfeit prescription pills to tens of thousands of victims. (Presentence Investigation Report ("PSR") ¶ 13). Instead of prescription drugs at a bargain, what customers actually received were phony pills made of fentanyl, para-fluorofentanyl—an analogue of fentanyl—and methamphetamine. (*Id*.). Shaped, dyed, and stamped to be indistinguishable from actual prescription medication, these tablets were in fact manufactured by the Enterprise in

---

[1] "Tr." refers to the trial transcript in *United States v. Francisco Alberto Lopez Reyes and Edward Eustate Jimenez*, S8 23 Cr. 501 (JPC) (S.D.N.Y. April 20, 2026 – June 1, 2026). Names in parentheticals after "Tr." citations refer to the witness whose testimony has been cited. "GX" refers to Government Exhibits admitted in that trial. "[A] sentencing court is entitled to rely on any type of information known to it, even information gleaned from a trial in which the person to be sentenced was neither a defendant nor represented by counsel." *United States v. Cacace*, 796 F.3d 176, 191 (2d Cir. 2015) (citation omitted).

industrial-scale milling facilities, or pill mills, located in the basements of several residential buildings in, among other places, Manhattan and the Bronx, New York.  (*Id.*).

As part of this scheme, the Enterprise shipped counterfeit pharmaceuticals to victims across the United States and around the world, including in all 50 U.S. states, Washington, D.C., the U.S. Virgin Islands, Puerto Rico, Germany, and Slovenia.  (PSR ¶ 14; GX 2101).  The victims of this criminal enterprise range in age from at least 23 to 77 years old.  (PSR ¶ 14).  They include veterans, doctors, lawyers, musicians, artists, politicians, economists, restaurant managers, personal trainers, dancers, former schoolteachers, administrative executives, and first responders, among others.  (*Id.*).  Some victims had legitimate prescriptions but could not obtain their medications through local brick-and-mortar pharmacies due to nationwide shortages.  (*Id.*).

The Enterprise preyed on people whom they characterized as "disabled" and "helpless." (PSR ¶ 15).  Some victims were in chronic pain from serious injuries—including those sustained in the line of duty—illness, or surgeries, and sought out prescription painkillers to manage their pain.  (*Id.*).  Some victims sought medication to cope with anxiety, post-traumatic stress disorder, and other mental health difficulties.  (*Id.*).  Others have battled long-term drug addiction.  (*Id.*).

Between in or about August 2023 and in or about June 2024, at least nine victims—all of whom purchased counterfeit prescription pills from the Enterprise—died of narcotics poisoning. (PSR ¶ 16).  One victim, Holly Holderbaum ("Holly")—referred to as Victim-1 in the Indictment and PSR—a 45-year-old woman, was a veteran who had served for twelve years in the United States Army National Guard.  (*Id.*).  Holly believed she was purchasing 30-milligram oxycodone, also known as "M30s," from the Enterprise's online pharmacy, but the pills were, in fact, made of fentanyl and para-fluorofentanyl.  (*Id.*).  Five days after receiving counterfeit oxycodone pills advertised, sold, manufactured, and shipped by the Enterprise, Holly died from acute fentanyl

intoxication.  (*Id.*).

Francisco Alberto Lopez Reyes, a/k/a "Frank" ("Lopez Reyes") led the enterprise, orchestrating and controlling every facet of the scheme from the Dominican Republic.  (PSR ¶ 17). With his co-conspirators, Lopez Reyes set up dozens of online pharmacy websites, designed to appear legitimate in order to lure customers into buying, at reduced prices, tablets of fentanyl, para-fluorofentanyl, and methamphetamine disguised as real prescription medications, including oxycodone, hydrocodone, Adderall, and Xanax, among others.  (*Id.*).  Lopez Reyes also relied on others, including Sadiq Abbas Habib Sayyed, a/k/a "Rakesh Sharma," a/k/a "Jonathan Acosta" ("Sayyed"), Khizar Mohammad Iqbal Shaikh ("Shaikh"), and Alba Gonzalez ("Gonzalez") to sell counterfeit pills to Americans over the internet and through encrypted messaging platforms and process payments for those pills.  (*Id.*).

To fulfill pill orders, Lopez Reyes enlisted Juan Efren Paulino, a/k/a "Freddy" ("Paulino") and Juan Moises Perez Mendez, a/k/a "Caballero" ("Perez Mendez") as his principal lieutenants to oversee the operation of multiple pill mills in New York City.  (PSR ¶ 18).  At those pill mills, workers used dyes with specific colors and specialized equipment with custom molds to press powdered narcotics so as to mimic the color, shape, size, and markings of commercially manufactured prescription pills, at rates of up to 4,000 to 7,000 pills per hour.  (Tr. 926:5-8 (Paulino)).  Law enforcement raided at least three of these pill mills and two other narcotics storage locations, seizing 647,208 counterfeit pills—the majority of which contained fentanyl, para-fluorofentanyl, and/or methamphetamine—nine industrial pill presses, commercial mixers, industrial-grade gas masks, and more.  (PSR ¶ 18; GX 1007; Tr. 282:24 – 283:8 (O'Leary discussing GX 1431); Tr. 418:24-419:6 (O'Leary discussing GX 1703); Tr. 606:21-607:9 (Woolcock discussing GX 1357)).  At these facilities, law enforcement also seized staggering

quantities of not yet processed narcotics.  In total, law enforcement seized approximately 72.6 kilograms (160 pounds) of para-fluorofentanyl, 99.6 kilograms (220 pounds) of fentanyl, and 97 kilograms of methamphetamine (214 pounds) of methamphetamine, in pill, powder, and crystal form.  (GX 1007).  Each of these seizures were a mere snapshot in time, representing only the working supply at these pill mills and storage locations at the time of the seizures.  (PSR ¶ 18). Multiple defendants—including Paulino, Perez Mendez, Wellington Eustate Espinal, a/k/a "Roni" ("W. Eustate Espinal" or "the defendant"), Heriberto Eustate Espinal, a/k/a "Daulin" ("H. Eustate Espinal"), Eusebio Peralta Bautista, a/k/a "Luis Collazo Santos" ("Peralta Bautista"), Hector Bienvenido Feliz Feliz, a/k/a "Tacoma" ("Feliz Feliz") and Luis Paulino ("Luis Paulino")— worked at these pill mills day and night.  (*Id.*).

After the Enterprise manufactured the counterfeit pills containing fentanyl and methamphetamine, a network of shippers, including Miguel Concepcion Brito ("M. Brito"), Cynthia Onega ("Onega"), Edward Eustate Jimenez, a/k/a "Chino" ("Eustate Jimenez"), Robert Junior Ramos Henriquez, a/k/a "Junior," a/k/a "Kiko" (Ramos Henriquez"), Jose Concepcion Brito ("J. Brito"), Angel Valdez Brito ("Valdez Brito"), and Wilianyi Almanzar Polanco ("Almanzar Polanco") packaged and mailed the pills to customers across the country at the direction of Lopez Reyes, who specified to whom and where to ship particular types and quantities of pills.  (PSR ¶ 19).  M. Brito and Onega managed their own shipping operation within the Enterprise at Lopez Reyes's direction, and they managed and supervised Valdez Brito and J. Brito, among others.  Eustate Jimenez likewise managed his own shipping operation within the Enterprise at Lopez Reyes's direction, and Eustate Jimenez managed and supervised Ramos Henriquez, Almanzar Polanco, and Marvin Polanco, among others.  After orders were delivered, the Enterprise bombarded customers with aggressive and manipulative marketing tactics to

5

pressure their victims to order more illegal pills, including by providing unsolicited free samples via mail of counterfeit pills containing addictive and deadly fentanyl and near-daily outreach by phone call or text message.  (*Id*.).  One victim had to block up to 30 phone numbers in an effort to stop the harassment.  (*Id*.).

### A. The Enterprise Sold Illegal Pills Through Online Pharmacy Storefronts

As part of their scheme to traffic fentanyl and methamphetamine disguised as real pharmaceuticals, the Enterprise developed online pharmacy storefronts that they designed to appear legitimate.  (PSR ¶ 21).  These e-commerce websites, some of which purported to be based in the United States, were operated by individuals abroad, including in India and the Dominican Republic.  (*Id*.).  While the websites varied in appearance and sophistication, they all had in common a claim to sell safe prescription medications at discount prices.  (*Id*.).  In reality, the websites purveyed deadly and illegal narcotics disguised as prescription pills.  (*Id*.).

### 1. Curecog.com

Curecog.com ("Curecog") purported to be a "US-based online pharma store" "approved by the FDA," which "serve[s] affordable medicines . . . approved by specialists and manufactured by trusted brands."  (PSR ¶ 22).  Curecog, however, was neither legitimate nor FDA approved. (*Id*.).  Instead, Curecog was a fraudulent storefront that peddled the Enterprise's illicit controlled substances, including fentanyl.  (*Id*.).  As described in more detail below, Holly ordered purported oxycodone from Curecog.  Five days after receiving her order, Holly died from having ingested the fentanyl and para-fluorofentanyl pills disguised as oxycodone that she ordered from Curecog.

Curecog featured many aspects of a legitimate e-commerce platform.  As depicted in the below screenshot of Curecog's homepage, a user could navigate by product category, click directly on a featured sale, search for particular merchandise, and place selected items into a digital cart.

(PSR ¶ 22). Curecog included an "About Us" page featuring stock photographs of doctors, a lengthy privacy policy, a copyright notice, and assurances on each of its webpages that it is an "online pharmacy site approved by the FDA" based in North Little Rock, Arkansas. (*Id*.). In reality, however, Curecog was registered with a domain registration company based in Russia, and there is no company in Arkansas by the name "Curecog." (*Id*.).



Curecog offered 40 different types of prescription medications, including purported medications for pain (including oxycodone), attention deficit hyperactivity disorder ("ADHD") (including Adderall), anxiety (including Xanax), "men['s] health" (including Viagra), sleeping

(including Ambien), and weight loss (including Meridia). (PSR ¶ 23). Curecog featured a webpage for each of these pills, among others, that included photographs of the pills, explanations of what conditions they treat, warnings about potential health complications, and descriptions of potential side effects. (*Id.*).

According to Curecog's website, one of its "popular brands" was oxycodone, an addictive opioid pain reliever for which a prescription is required under United States law. (PSR ¶ 24). A screenshot of the webpage for oxycodone is below and offers several types and dosages of the purported medication.



Curecog's webpage for oxycodone included at least two different sections about safety: "Safety Measures You Need to Know" and "Safety Measures to Buy Oxycodone Online." (PSR ¶ 24). Curecog urged customers to "[b]e sure to thoroughly look into the pharmacy you are buying

from," and to "[t]ry to look for reviews and delivery proof." (*Id.*). To that end, Curecog provided customers with so-called customer reviews, including a supposed five-star review depicted below:



Aspen Waters – *October 20, 2023*                ★★★★★

Hi folks, I'm writing this review to express my gratitude towards Curecog. They have delivered my medicines safely, securely, and fast to my doorstep. Coming to the medicine Oxycodone 10 mg, I think it was a life savior for me. In terms of pain control, I would rate this medicine 10 out of 10.

Although the Enterprise designed Curecog to provide indicia of legitimacy, Curecog operated in a fashion markedly different from legal e-commerce sites. (PSR ¶ 25). For instance, after a particular dosage of oxycodone was selected, placed in the digital cart, and ordered, the customer would receive a text message from an administrator of Curecog ("CC-1") directing the customer to call CC-1 to confirm and pay for the order. (*Id.*). On or about September 6, 2024, for example, an undercover law enforcement officer placed an order for 30-milligram oxycodone pills from Curecog and, shortly thereafter, received a text from CC-1 requesting that the law enforcement officer call CC-1 to confirm his oxycodone order. (*Id.*). On the call, CC-1 repeatedly assured the undercover officer of the high quality of the oxycodone pills and denied that the pills were mixed with other substances. (*Id.*).

On or about September 20, 2024, CC-1 introduced the undercover law enforcement officer to CC-1's supervisor ("CC-2"). (PSR ¶ 26). During a call on or about September 24, 2024, CC-2 told the undercover law enforcement officer, in sum and substance, that CC-2 operated over 40 websites from India through which he sold pills to American customers, many of whom CC-2 described as "helpless" and "disabled." (*Id.*).

Holly also ordered purported oxycodone from Curecog and spoke to CC-1. As described in more detail below, on or about February 12, 2024, Holly placed an order with Curecog for anti-

9

anxiety medication, and CC-1 directed Holly to pay for the order by sending money electronically to Gonzalez. Holly later emailed Gonzalez to change the order to oxycodone. Following that change, Lopez Reyes and his workers fulfilled Holly's order with counterfeit oxycodone pills. Specifically, on or about February 16, 2024, Ramos Henriquez and Marvin Polanco—referred to as "CC-4" in the PSR—shipped Holly's package at Lopez Reyes's and Eustate Jimenez's direction. Upon receipt of the pills, on or about February 20, 2024, Holly searched the internet, attempting to determine if the pills she had received that day from Curecog were legitimate 30-milligram oxycodone tablets. Contrary to her internet findings, they were not. Days later, those pills killed her. Holly's cause of death was acute fentanyl intoxication.

### 2. *Pharmacy Stores Online and Care Online Store*

The Enterprise also worked with the operators of pharmacystoresonline.com ("Pharmacy Stores Online") and careonlinestore.com ("Care Online Store"), which appear to be designed using the same template. (PSR ¶ 27). According to the nearly identical "About Us" webpages of these websites, Pharmacy Stores Online and Care Online Store each purported to be a "leading, credible and 100% authentic pharmacy store." (*Id*.). As depicted below, the homepages of Pharmacy Stores Online and Care Online Store featured nearly identical design elements and contained, among other things, categories of pharmaceuticals for purchase, a search bar, featured products, contact information for salespeople scrolling across the top, and the ability to switch prices between U.S. Dollars and Great British Pounds. (*Id*.). Pharmacy Stores Online claimed to be based in Los Angeles, California, while Care Online Stores purported to be based in Brooklyn, New York; both, in their respective FAQs, asserted, "We are located in USA and we have

warehouse[s] located in USA, UK and Netherlands." (*Id.*).

 

The websites for Pharmacy Stores Online and Care Online Store also contained identical FAQs, "Privacy Policies," "Cookies Policy," and "Return and Exchange Policies." Within minutes of loading the websites for both Pharmacy Stores Online and Care Online Store, an automatic chat bot would appear to assist with ordering. The bot from Pharmacy Stores Online, depicted below left, noted "if you have any questions about medication or need information about discounts, feel free to reach out to me" and provided an email in addition to live chat, whereas the bot at Care Online Store, depicted below right, included a phone number and code "for a 20% discount."

 

11

On their websites, Pharmacy Stores Online and Care Online Store purported to sell medications for pain (including oxycodone), ADHD (including Adderall), and anxiety (including Xanax), among other ailments.  (PSR ¶ 27).

Victim-2, a 39-year-old New Yorker, ordered from Pharmacy Stores Online after searching the internet using phrases such as "Adderall online."  (PSR ¶ 28).  Victim-2 was prescribed Adderall by his doctor, but could not fill his prescription at the pharmacy due to nationwide shortages.  (*Id*.).  Between in or about October 2023 and in or about February 2024, Victim-2 placed multiple orders for 90 Adderall pills from the Enterprise for approximately $400 to $600 per order.  (*Id*.).  As described in more detail below, those orders were fulfilled by Lopez Reyes, who texted Eustate Jimenez, M. Concepcion Brito, and Onega, and directed them to send pills to Victim-2 at the address Victim-2 provided to Pharmacy Stores Online.  (*Id*.).  Although Victim-2 ordered what he understood to be Adderall pills, Lopez Reyes, Eustate Jimenez, M. Concepcion Brito, and Onega sent Victim-2 pills made from methamphetamine that were pressed to resemble legitimate Adderall in color, shape, size, and imprint.  (*Id*.).  Upon taking the counterfeit Adderall, Victim-2 sometimes became sick, anxious, or depressed.  (*Id*.).  Victim-2 then stopped ordering pills from the Enterprise.  (*Id*.).  Even so, as described in more detail below, Victim-2 received repeated calls and messages asking if he wished to purchase more purported Adderall at a discount.  (*Id*.).

### 3.  *YourPhamacy*

In addition to fulfilling orders from websites like Curecog and Pharmacy Stores Online through his networks, Lopez Reyes also directly controlled a number of online pharmacies, including yourphamacy.online ("YourPhamacy").  (PSR ¶ 29). YourPhamacy, which used a URL that contained a misspelling of the word "pharmacy," purported to sell real prescription

12

pharmaceuticals, such as oxycodone, hydrocodone, Xanax, and Adderall, but in reality, sold counterfeit pills disguised as legitimate pharmaceuticals. (*Id.*).

As depicted below, YourPhamacy's homepage featured a phone number and email address, as well as featured sales, categories of pills, guarantees of free shipping, 24/7 support, secure payment, and a 30-day return policy.



YourPhamacy's sales webpage for oxycodone, depicted below, featured a photograph of YourPhamacy's purported 30-milligram oxycodone pills, or M30s, containing an "M" on one side and a "30" over a median line on the other side. (Ind. ¶ 25).



YourPhamacy's image of the 30-milligram oxycodone pill appeared to have been downloaded directly from a "Drug Fact Sheet" from the official website of the United States Drug Enforcement Administration ("DEA") concerning counterfeit pills, which warned "[c]ounterfeit pills may contain lethal amounts of fentanyl or methamphetamine and are extremely dangerous because they often appear identical to legitimate prescription pills." (Ind. ¶ 26). YourPhamacy's webpages did not feature the same warning. (*Id.*). Pictured below are the DEA photograph of authentic oxycodone, and the identical YourPhamacy photograph of the purported oxycodone it sells. (*Id.*). Lopez Reyes used the image, below left, that customers could compare to the image, below right, that the DEA had provided in an attempt to protect the public, to convince customers

the pills the Enterprise sold were genuine. (*Id*.). In fact, YourPhamacy's apparent 30-miligram

oxycodone pills were actually made of fentanyl and para-fluorofentanyl. (*Id*.).

**Your Pharmacy**             **DEA Drug Fact Sheet**

  

**B.       The Enterprise Manufactured Millions of Counterfeit Prescription Pills Using Deadly Narcotics**

The Enterprise sold fake prescription drugs that were manufactured in at least three

industrial-scale pill mills located in the basements of residential buildings throughout New York

City: (i) a mill located on Wadsworth Avenue in the Washington Heights neighborhood of New

York, New York (the "Wadsworth Pill Mill"); (ii) a mill located on Beaumont Avenue in the

Bronx, New York (the "Beaumont Pill Mill"); and (iii) a mill located on Gerard Avenue in the

Bronx, New York (the "Gerard Pill Mill"). (PSR ¶ 38). Discussed further below, the Enterprise

also manufactured fake prescription drugs at a pill mill in Lawrence, Massachusetts, operated by

Leury Then, a/k/a "Leo." (Tr. 2296:4-2302:3 (Ramos Henriquez)). The pill mills were industrial-

scale factories, each capable of producing 4,000 to 7,000 pills per hour. (Tr. 926:5-8 (Paulino)).

The Enterprise combined powdered narcotics, including fentanyl, para-fluorofentanyl, and

methamphetamine, with inert substances like calcium pills, which they purchased in bulk. (*Id*.).

The mixtures were then colored with dyes and pressed into pills using industrial-scale pill presses.

(*Id*.). These presses were fitted with die molds purchased by the Enterprise from vendors based in

the People's Republic of China. (*Id*.). The die molds shaped, compressed, and stamped powdered

narcotics into solid tablets, so that the pills appeared to be legitimate pharmaceuticals complete

15

with the same lettering and numbering. (*Id.*). What appeared to be oxycodone, hydrocodone, and Percocet contained narcotics such as fentanyl and para-fluorofentanyl; what appeared to be Adderall contained methamphetamine. (*Id.*).

From the Dominican Republic, Lopez Reyes managed the pill mills. (PSR ¶ 39). Lopez Reyes funded the operations of the pill mills and directed others, including Paulino and Perez Mendez, on how to make his pills. (*Id.*). Lopez Reyes controlled the production of the fake pharmaceuticals, specifying the quantity and types of pills to be produced. (*Id.*). When the pills did not meet his specifications, either because the pills were not sufficiently potent or did not look similar enough to real pharmaceuticals, Lopez Reyes ordered their reproduction. (*Id.*).

The Wadsworth, Beaumont, and Gerard Pill Mills were manned by members of the Enterprise, who worked long shifts, spanning days, pressing deadly powdered narcotics into millions of counterfeit pharmaceutical pills to be shipped to victims around the United States and the world. (PSR ¶ 40). When law enforcement disrupted one pill mill, the Enterprise would simply use another. (*Id.*).

### 1.  *The Wadsworth Pill Mill*

The Wadsworth Pill Mill, which was hidden in the basement of a residential building in Manhattan, New York, was searched and shut down by law enforcement on or about May 31, 2023. (PSR ¶ 41). There, law enforcement officers seized 204,241 already-made pills as well as bricks, bags, and buckets filled with powdered narcotics ready to be pressed into pills, depicted, in part, in the photograph below. (GX 1007). In total, law enforcement officers seized, among other

narcotics, (i) more than 46 kilograms of fentanyl, (ii) more than 500 grams of para-fluorofentanyl, and (iii) more than 45 kilograms of methamphetamine in the form of pills and powder.  (GX 1007).



Law enforcement officers also found the equipment used to transform powdered narcotics into pill form, including three commercial-grade pill presses and a commercial grade-mixer.  (PSR ¶ 41).  One of the pill presses is pictured below on the left; the mixer is pictured below on the right. (*Id.*).

 

Paulino managed the operations of the Wadsworth Pill Mill, under the direction and supervision of Lopez Reyes. (*See* PSR ¶ 42). Paulino employed approximately seven individuals at the Wadsworth Pill Mill, including Perez Mendez and Feliz Feliz. (Tr. 928:6-18 (Paulino)). Working at the direction of Paulino, these workers would, among other things, grind pills made of inert substances into powdered form; mix the inert substances with colored dyes and powdered narcotics like fentanyl, para-fluorofentanyl, and methamphetamine; press the narcotics mixtures into pills; clean, count, sort, and bag the pills for eventual distribution; deliver the pills to shippers; and clean the facility. (PSR ¶ 42).

The workers at the Wadsworth Pill Mill also assisted Paulino in procuring pill presses and parts for those presses. (PSR ¶ 43). For example, on or about January 14, 2023, Perez Mendez, who at the time was working for Paulino at the Wadsworth Pill Mill, sent a message to Paulino that stated, in sum and substance, that a die mold had arrived and sent the below photograph of a die mold, which was used to stamp powdered fentanyl mixtures into counterfeit oxycodone pills marked with a "M" and "30." (*Id.*).



From the Dominican Republic, Lopez Reyes was in near-daily contact with Paulino, ordering him to increase production of pills in response to customer demand. (PSR ¶ 44). For example, on or about April 12, 2022, Lopez Reyes messaged Paulino, instructing him, in sum and substance, "to make at least 20 thousand [fake oxycodone pills] . . . Because I have clients waiting." (*Id.*).

Lopez Reyes also instructed Paulino on ways to produce higher quality pills at a large volume. (PSR ¶ 45). For example, on or about April 9, 2022, Lopez Reyes told Paulino, in sum and substance, to use a particular blender that "grinds [] really well." (*Id.*). It makes the [narcotics-mixture] finer without clumps." (*Id.*). Lopez Reyes also instructed Paulino to obtain, in sum and substance, "a minimum of two [pill press] machines." (*Id.*).

Lopez Reyes took other steps to ensure that the Wadsworth Pill Mill produced pills that closely resembled real pharmaceuticals. (PSR ¶ 46). For example, on or about May 15, 2023, Lopez Reyes sent Paulino a photograph of pills accompanied by a voice note stating, in sum and substance, "We are having problems, Freddy, with the pills having two different colors. This can't keep happening. It has to be an exact color. Ones are lighter than others, some bluer than others." (*Id.*).

Lopez Reyes also directed Paulino to increase the strength of the pills, by adding more narcotics. (PSR ¶ 47). On at least one occasion, after Lopez Reyes expressed his dissatisfaction with the potency of the fake pharmaceuticals produced at the Wadsworth Pill Mill, Paulino ordered his employees to re-grind the pills. (*Id.*). On or about May 24, 2023, Lopez Reyes messaged Paulino and stated, in sum and substance, "a lot of clients complained about the quality Adderall [sic]." (*Id.*). Paulino responded, in sum and substance, that he would make the pills stronger. (*Id.*).

19

### 2. *The Beaumont Pill Mill*

The Beaumont Pill Mill, which was hidden in the basement of a residential building in the Bronx, New York, was searched and shut down by law enforcement officers on or about October 5, 2023. (PSR ¶ 48). There, law enforcement officers seized (i) approximately nine kilograms of fentanyl and over 14 kilograms of methamphetamine in the form of over 97,000 pills; and (ii) over 12 kilograms of fentanyl and over seven kilograms of a mixture of para-fluorofentanyl fentanyl, heroin, caffeine, and other substances in the form of powder. (*Id.*; *see also* GX 1007).



Law enforcement officers also recovered equipment used to press powdered narcotics into pills, including four industrial pill presses, blenders, dyes, and jars of calcium citrate. (Tr. 283:6-8, 284:4-19, 295:9-24 (O'Leary)).

The Beaumont Pill Mill was built to be a fentanyl, para-fluorofentanyl, and methamphetamine pill pressing factory. (PSR ¶ 49). The first-floor windows of the Beaumont Pill Mill were covered with black trash bags and dark fabric, preventing outside observers from viewing what was occurring inside. (*Id.*). The Beaumont Pill Mill was also equipped with a surveillance system, including a television screen displaying a live feed of security camera footage from outside the pill mill. (*Id.*). A pill press and industrial-grade gas masks to protect workers from the deadly narcotics being pressed, recovered from the Beaumont Pill Mill, are depicted in the photographs below.

 

H. Eustate Espinal and W. Eustate Espinal managed the operations of the Beaumont Pill Mill, supervising Eustate Jimenez, Roberto Vargas Paulino, and Cristian Eustate Espinal. (PSR ¶ 50). These workers at the Beaumont Pill Mill, among other things, procured inert substances to be mixed with narcotics, counted and sorted pills, and cleaned the space in which the mill operated. (*Id.*).

Paulino, H. Eustate Espinal, and W. Eustate Espinal, worked closely together to manage continuing operations at their respective mills. (PSR ¶ 51). When the pill presses at the

Wadsworth Pill Mill were not working, Paulino turned to the Beaumont Pill Mill as his source of pill manufacturing. (*Id*.). Wadsworth Pill Mill workers also went to the Beaumont Pill Mill to obtain parts for pill presses. (*Id*.).

After law enforcement officers arrested Paulino on or about May 31, 2023, and shut down the Wadsworth Pill Mill, Lopez Reyes turned to Perez Mendez to take over his pill manufacturing process in New York, although Paulino continued to play an active role directing the organization's operations from prison. (PSR ¶ 52). With the Wadsworth Pill Mill closed, Perez Mendez began overseeing the pressing of counterfeit pills for Lopez Reyes at the Beaumont Pill Mill. (*Id*.). Perez Mendez provided die molds to shape the narcotics into pills, directed the Beaumont Pill Mill workers to manufacture pills that were uniform in color so that they looked real, inspected the pills to ensure that they appeared to accurately resemble legitimate pharmaceuticals, and personally participated in the pill manufacturing process itself. (*Id*.). Perez Mendez also coordinated shipping the pills manufactured at the Beaumont Pill Mill to victims across the country at the direction of Lopez Reyes. (*Id*.).

### 3. *The Gerard Pill Mill*

The Gerard Pill Mill, which was hidden in the basement of a residential building in the Bronx, New York, was searched and shut down by law enforcement officers on or about April 6, 2024. (PSR ¶ 53). There, law enforcement officers seized 101,344 already-made pills, as well as narcotics in powder form ready to be pressed into pills, depicted, in part, in the photograph below. (*Id*.; GX 1007). In total, law enforcement officers seized (i) approximately 29 kilograms of para-fluorofentanyl and approximately 800 grams of methamphetamine in the form of pills; (ii) approximately 1.9 kilograms of fentanyl and 13 kilograms of methamphetamine in the form of

powder; and (iii) approximately 2.9 kilograms of methamphetamine in the form of crystal. (PSR ¶ 53; GX 1007).



Law enforcement officers also recovered the two industrial-scale pill presses, depicted below, as well as materials used to mix powdered narcotics with inert substances, and materials used to package narcotics for further distribution. (PSR ¶ 53). Those items included mixing bowls, a blender, strainers, dyes, empty bottles of pills ground for filler, and thousands of glassine envelopes used to package the drugs. (*Id.*).

 

23

Perez Mendez and Peralta Bautista worked at the Gerard Pill Mill, pressing powdered narcotics into pills.  (PSR ¶ 54).  Perez Mendez managed operations at the Gerard Pill Mill and reported directly to Lopez Reyes.  (*Id.*).  For example, on or about March 15, 2024, Perez Mendez texted Lopez Reyes inventories of pills on hand, noting, among other things, that the mill had "32,000 – M30[s]," a reference to the "M" and "30" stamped into legitimately manufactured 30-milligram oxycodone pills.  (*Id.*).  Lopez Reyes ordered Perez Mendez to turn to producing counterfeit Adderall and hydrocodone.  (*Id.*).  Similarly, on or about April 2, 2024, Lopez Reyes ordered Perez Mendez, in sum and substance, to produce "more hydro m367," a reference to the "M367" stamped into legitimately manufactured Vicodin, a prescription drug made principally from hydrocodone.  (*Id.*).  On or about April 6, 2024, while discussing the manufacture of certain fake drugs, Perez Mendez messaged Lopez Reyes, asking Lopez Reyes, in sum and substance, "what's printed on the front and what's printed on the back of the orange ones?"  (*Id.*).  Lopez Reyes responded, in sum and substance, "AD and on the other side 30," and included a photograph of what appear to be counterfeit Adderall pills.  (*Id.*).

Lopez Reyes also funded the operations of the Gerard Pill Mill.  (PSR ¶ 55).  For example, on or about April 3, 2024, Lopez Reyes messaged Perez Mendez and tried to confirm whether Perez Mendez had received money so that Perez Mendez could produce "large quantities" of pills. (*Id.*).

### C.    Shippers Mailed Counterfeit Prescription Pills to Victims Across the United States

To distribute the drugs his Enterprise manufactured in basements in New York City and elsewhere, Lopez Reyes employed a network of shippers who mailed counterfeit pills created at the pill mills to victims across the country.  (PSR ¶ 56).  Lopez Reyes trained those shipping on his behalf on how to package the pills, provided the names and addresses of victims, the quantity

24

and types of pills to send them, and shipping instructions, including whether to, for example, overnight the pills—information that he received from victims that ordered from websites or encrypted messaging applications operated by him and others.  (*Id.*).

Lopez Reyes also directed those shipping for him to launder money.  (PSR ¶ 57).  Victims were told to pay for counterfeit pills by making payments through money transfer programs like Chime, PayPal, Apple Pay, Zelle, CashApp, and cryptocurrency.  (*Id.*).  These shippers were, in turn, directed by Lopez Reyes to transfer this money to others, including to people in the Dominican Republic, who ultimately transferred those funds to Lopez Reyes.  (*Id.*).  Other times, Lopez Reyes directed the shippers to use the funds to pay pill manufacturers.

### 1.  *Dariel Nunez*

In or about 2022, Lopez Reyes recruited a new shipper, Dariel Nunez, referred to as "CC-3" in the Indictment and PSR.  (PSR ¶ 58).  Nunez began shipping large quantities of pills—up to approximately 30 packages a day—to victims across the country from post offices located throughout New Jersey and New York.  (*Id.*).  Lopez Reyes paid Nunez between approximately $1,500 and $5,000 per week to ship counterfeit pills.  (*Id.*; Tr. 1364:22-23 (Nunez)).  Nunez, who was one of many shippers Lopez Reyes employed, personally shipped packages to victims in more than 30 states.  (PSR ¶ 58).

Paulino supplied the pills that Nunez, in turn, shipped.  (PSR ¶ 60).  Paulino met Nunez at locations throughout the Bronx and Manhattan and handed Nunez backpacks containing thousands of pills.  (*Id.*).  Nunez paid Paulino thousands of dollars at a time from the money that Nunez had received from victims.  (*Id.*; Tr. 1373:1-7 (Nunez)).

### 2.  *Eustate Jimenez*

In or about March 2023, Lopez Reyes and Paulino recruited Eustate Jimenez to ship packages of fake pills manufactured at the Wadsworth Pill Mill.  (PSR ¶ 61).

25

Lopez Reyes and Paulino supervised the work of Eustate Jimenez. (PSR ¶ 61). Paulino provided Eustate Jimenez with pills he subsequently shipped to victims. (*Id.*). In turn, Lopez Reyes sent Eustate Jimenez the pill orders, which included the types of pills to send, the quantity of pills, the names and addresses of the recipients, and the shipping instructions. (*Id.*). Eustate Jimenez then packaged and mailed the pills from post offices located throughout Washington Heights and the Bronx in New York City, and at times, from post offices located in Lawrence, Massachusetts. (*Id.*).

After the arrest of Paulino in or about May 2023, Perez Mendez began working with Eustate Jimenez to continue to ship narcotics to victims without pausing operations. (PSR ¶ 62). For example, Eustate Jimenez periodically sent Perez Mendez audits of his pill supply, noting, for example, on or about December 11, 2023, that he had 25,000 counterfeit 30-milligram oxycodone pills on hand. (*Id.*). In one voice note sent on or about December 12, 2023, by Perez Mendez to Eustate Jimenez, while they coordinated a pickup of pills, the sound of a pill press machine could be heard in the background. (*Id.*). In another communication, on or about January 30, 2024, Eustate Jimenez informed Perez Mendez that he had 120,000 30-milligram oxycodone pills on hand. (*Id.*). Photographs sent by Eustate Jimenez to Perez Mendez of thousands of counterfeit oxycodone, hydrocodone, and Adderall pills, respectively, are reproduced below:



26

Eustate Jimenez also recruited others to assist him in shipping pills, including Almanzar Polanco, Ramos Henriquez, and Marvin Polanco.  (PSR ¶ 63).  Ramos Henriquez and Marvin Polanco largely shipped pills from post offices located in and around Lawrence, Massachusetts. (*Id.*).    In addition, as discussed above, Eustate Jimenez recruited a Lawrence-based pill manufacturer for Lopez Reyes: Leo, referred to as "CC-5" in the PSR.  Ramos Henriquez introduced Eustate Jimenez to Leo, and Eustate Jimenez and Ramos Henriquez recruited Leo to manufacture pills for Lopez Reyes's operation. (*Id.*).  Eustate Jimenez showed photographs to Leo of the kind of pills that Lopez Reyes needed, and Leo agreed to manufacture fake oxycodone and fake Adderall pills for Eustate Jimenez. (*Id.*).  Eustate Jimenez gave specific instructions to Leo regarding how to manufacture the pills the way that Lopez Reyes liked, including to use fentanyl to make the counterfeit oxycodone pills, and to use crystal meth to make the counterfeit Adderall pills. (*Id.*).  Leo delivered thousands of pills to Eustate Jimenez and Ramos Henriquez in the fall of 2023 and first two months of 2024, which Eustate Jimenez, Ramos Henriquez, and Marvin Polanco subsequently shipped to Lopez Reyes's customers. (*Id.*).

On or about February 26, 2024, Eustate Jimenez and Almanzar Polanco were arrested at a post office in Manhattan while attempting to mail more than 35 packages containing 4,412 fake prescription pills.  (PSR ¶ 64; GX 1007).  The contents of two of the priority mail packages, containing counterfeit oxycodone and counterfeit Adderall, are pictured below.

 

After arresting Eustate Jimenez and Almanzar Polanco, law enforcement officers searched Eustate Jimenez's apartment in the Washington Heights neighborhood of New York, New York, from where Eustate Jimenez and Almanzar Polanco distributed narcotics (the "Stash House"). (PSR ¶ 65). During the search, law enforcement officers found, as depicted in part in the photograph below, approximately 83,000 counterfeit prescription pills, including fake Oxycontin, oxycodone, Adderall, and Xanax; 2,000 unused United States Postal Service ("USPS") priority mail envelopes; and shipping receipts. (*Id.*; GX 1007). In total, from the post office and Eustate Jimenez's apartment, law enforcement officers seized approximately 6.8 kilograms of fentanyl, 18.6 kilograms of para-fluorofentanyl, and 4.85 kilograms of meth, in the form of pills. (GX 1007).



Over the course of just three months—from in or about December 2023 through the date of the arrest of Eustate Jimenez on or about February 26, 2024— Eustate Jimenez, with the assistance of Almanzar Polanco, Ramos Henriquez, and Marvin Polanco, shipped at least

28

approximately 1,800 packages containing approximately 328,000 counterfeit pills to victims living in all 50 U.S. states, Washington, D.C., Puerto Rico, and the U.S. Virgin Islands, including Holly, who died thereafter.  (PSR ¶ 66).

### 3.  *Onega and the Britos*

Lopez Reyes and Perez Mendez recruited M. Brito and Onega, who in turn recruited J. Brito, and Valdez Brito, to ship millions of fake pills to victims across the country.  (PSR ¶ 67).

M. Brito and Onega received pills manufactured by Perez Mendez and his employees. (PSR ¶ 68).  M. Brito and Onega sorted and packaged the pills and directed J. Brito and Valdez Brito to ship the packages to victims across the country according to the shipping instructions given to them by Lopez Reyes.  (*Id.*).  J.  Brito and Valdez Brito shipped victims approximately 35 packages per day for approximately four months.  (Tr. 2016:4-2017:3, 2020:3-12 (Angel Brito)).

M. Brito and Onega packaged the pills in their apartment, where they lived with a young child, and stored narcotic pills in Onega's vehicle, surrounding the child's car seat.  (PSR ¶ 69). On or about December 4, 2023, law enforcement officers searched that vehicle and seized 156,696 counterfeit pills containing approximately 15.16 kilograms of fentanyl, 23.93 kilograms of para-fluorofentanyl, and 17 kilograms of methamphetamine, including as depicted in part below.  (GX 1007).



Over the course of just four months—from in or about July 2023 through on or about December 4, 2023—M. Brito, Onega, J. Brito, and Valdez Brito shipped at least approximately 4,500 packages containing at least approximately 580,000 counterfeit pills to approximately 2,200 unique victims.  (PSR ¶ 70).  The victims lived in all 50 U.S. states, the U.S. Virgin Islands, and other countries including Germany and Slovenia.  (*Id*.).

### D.      The Enterprise Used Manipulative Marketing to Keep Victims Coming Back

Once pills had been delivered to victims, the Enterprise developed strategies for ensuring that these victims continued to place orders through their network of online counterfeit pharmacies and messaging channels.  (Ind. ¶ 76).  These strategies included the provision of free "sample" pills as well as unrelenting manipulative marketing communications.  (*Id*.).  The Enterprise found success in both approaches, targeting individuals who, in some cases, were already chemically dependent on the products that the Enterprise was aggressively pushing.  (*Id*.).

### 1.  *Free Samples*

One way in which the Enterprise sought to ensure customers placed orders for purported prescription pills from their distribution channels, and not from some other source, was through the use of free samples of counterfeit drugs containing fentanyl.  (Ind. ¶ 77).

At the direction of Lopez Reyes, Nunez placed flyers advertising the Enterprise's websites and other communication channels into many of the pill orders he fulfilled.  (Ind. ¶ 78).  When instructed to do so by Lopez Reyes, Nunez also often placed in his shipments an additional one to five pills along with the flyer.  (*Id*.).  Lopez Reyes directed Nunez as to which customers were to receive the free samples, the number and type of pills that should be placed in the free samples, as well as what information to include in the flyers.  (*Id*.).  The flyers, an example of which is depicted

30

below, typically included a phone number and website where pills could be ordered, which Lopez

Reyes would periodically direct Nunez to update as he opened new websites.  (*Id.*).

> Dear customer,
>
> Do you need a good pharmacy service, with a good economic price? At ███████████, we have the best service and prices on the market....
>
> To show our favorite customers that this is a guaranteed service. Here we are sending you a small sample of our service. ███████████ is a unique service, which guarantees you, to send your package the same day guaranteed!
>
> For more information on, ███████████.
>
> Contact us at:
> Phone +1 ███████  https://███████ com/
>
> Thanks for everything,
>
> Sincerely,
>
> ███████

Victim-4, who was a 69-year-old grandmother from Tennessee, had begun ordering

purported pharmaceuticals from the Enterprise in or about November 2023.  (PSR ¶ 20; GX 2101).

On or about June 26, 2024, Victim-4 died of intoxication by fentanyl and other drugs.  (*Id.*).  At

the time of her death, Victim-4 had counterfeit 30-milligram oxycodone pills in her home.  (*Id.*).

The pills, which resembled legitimately manufactured oxycodone pills with the distinctive "M30"

imprint, tested positive for fentanyl.  (*Id.*).  After Victim-4 stopped ordering pills from the

Enterprise because she had died of narcotics poisoning, the Enterprise sent to Victim-4's home

address one of these advertisements with free "sample" pills to try and encourage more orders.

(*Id.*; Tr. 2707:14-20 (Gary Brown)).  Specifically, on or about July 20, 2024—less than one month

after Victim-4's death—a package addressed to Victim-4 was delivered to her home.  (PSR ¶ 20;

Tr. 2707:14-20 (Gary Brown)).  The package contained five counterfeit hydrocodone pills

containing fentanyl that resembled the shape, color, and imprint of legitimate hydrocodone medication.  (PSR ¶ 20; Tr. 2709:25-2710:19 (Gary Brown)).  Accompanying these pills was a flyer in which Lopez Reyes claimed to have "the best price and the best quality on the market. Either wholesale or retail."  (PSR ¶ 20; Tr. 2709:1-14 (Gary Brown); GX 406).  The flyer noted that "if you do business with us, we will ship your order immediately," including through "one day delivery express mail with a tracking number so you can follow up on the package."  (Tr. 2709:10-14 (Gary Brown); GX 406). After providing prices for 90, 180, 360, and 600 "tabs," the advertisement encouraged, "you can either contact us by number or email or [by] visiting our website," and listed a particular phone number as "customer care," a particular email address for "medscustomerservice," and the website for YourPhamacy, discussed at length above.  (Tr. 2709:18-21 (Gary Brown); GX 406).

Lopez Reyes owned and operated both the YourPhamacy website and the medscustomerservice email inbox ("Meds Customer Service").  (Ind. ¶ 80).  From in or about April 2024 to in or about August 2024, the Meds Customer Service inbox received approximately 100 messages from individuals inquiring about pills, many of which referenced free samples of medication received alongside flyers advertising the email address.  (*Id*.).  Several victims appeared to believe Meds Customer Service to be a legitimate pharmacy, with one victim writing he "may be interested in filling one of my prescriptions with you if prices are better than my current provider."  (*Id*.).  Others ordering from Meds Customer Service inquired about quantities consistent with redistribution in street level drug dealing, with one individual seeking "600 percocet 600xanax and 600 hydro the Watson ones and 600 roxys."  (*Id*.).  And others exhibited desperate drug-seeking behavior, including by sending six emails in four hours with pleas such as

32

"PLEASE HELP ME??? U sent me a letter yesterday with a sample of ur product. I would like to purchase some but no one will contact me."  (*Id.*).

### 2.  *Manipulative Marketing*

In addition to sending free samples, the Enterprise also employed manipulative or harassing marketing techniques to pressure victims of their scheme to continue making purchases of counterfeit pills.  (Ind. ¶ 81).  In particular, once an order was placed, the Enterprise remained in near constant contact with their victims to offer additional narcotics and highlight supposed customer discounts.  (*Id.*).  Victims reported receiving frequent outreach from the Enterprise via phone calls, text messages, emails, and encrypted message about purchasing additional pills, to a degree that many victims found to be harassing.  (*Id.*).  But even when these victims blocked the contact numbers, the Enterprise continued their outreach using new numbers.  (*Id.*).  One victim (Victim-5), described in more detail below, reported blocking around 20 to 30 different phone numbers in an effort to stop receiving communications after having placed an order from the Enterprise.  (*Id.*).

Victim-2 experienced precisely this type of harassment.  (Ind. ¶ 82).  After making two purchases of Adderall from Pharmacy Stores Online, described in detail above, Victim-2 began receiving WhatsApp chats and text messages offering purported discounted Adderall and Ritalin, another ADHD drug.  (*Id.*).  Between in or about April and June 2024, Victim-2 received approximately 19 different messages and several phone calls asking if he wished to purchase prescription drugs.  (*Id.*).  For example, on or about May 22, 2024, Victim-2 received the message, "Hi [Victim-2] any order for me?  Huge discount for Adderall and for Ritalin?" and then five days later, on or about May 27, 2024, received two messages, "Hi [Victim-2], how are you dear? Aderall [sic] and Ritalin is on discount would you like to order for any?" and "Hi [Victim-2], how

are you dear?  It's Jennifer.  would you like to order Ritalin or Adderall today with discount?" (*Id.*).

Throughout in or about June 2024, Victim-2 again received similar, apparently automated messages, including: (i) On or about June 5, "Hi [Victim-2], how are you dear?  It's Jennifer[.] would you like to order Ritalin or Adderall today with discount?" (ii) On or about June 7, "Hi [Victim-2], It's Jennifer.  would you like to order Ritalin or Adderall today with discount?" (iii) On or about June 14, "Hi [Victim-2], how are you?  It's Jennifer.  Any order for me?" (iv) On or about June 20, "Hi [Victim-2]we do have now Teva brand Adderall with $ sigh in USA stock.  Do let me know if you are interested to make order for that?" (v) On or about June 27, "Hi [Victim-2], how are you?  It's Jennifer.  Are you ready to make an order?"  (Ind. ¶ 83).  The penultimate message, from on or about June 20, 2024, included a photograph of purported Adderall.  (*Id.*). When these attempts to pressure Victim-2 into additional purchases of methamphetamine disguised as Adderall were unsuccessful, Victim-2 began receiving messages from another number, which stated, on or about June 20, 2024, "Hi [Victim-2], Just to let you know we got T va brand with $ marking for Adrl 30.  Would you like to ordr [sic] for that?" and, on or about June 25, 2024, "Hi [Victim-2], Would you like to 0rdr for round Adrl 30.  with best quality and with huge discounts?"  (*Id.*).

Similarly, Victim-5, a psychiatrist, was prescribed painkillers after receiving a knee replacement approximately one year ago, but, when her prescription ran out, she turned to online pharmacies to obtain oxycodone without a prescription.  (Ind. ¶ 84).  In or about November 2023, after placing two orders for Percocet on a website operated by the Enterprise, Victim-5 received the pills, which appeared to her to be fake.  (*Id.*).  Thereafter, she started receiving numerous calls from individuals trying to sell her prescription pills.  (*Id.*).  Even after she blocked some numbers,

she would receive calls from other numbers trying to sell her prescription pills. (*Id*.). She had to block dozens of phone numbers in order to stop receiving the Enterprise's outreach. (*Id*.).

Besides Victim-5, several customers who received pills from the defendants' scheme reported to law enforcement officers that, after receiving their orders, they were bombarded with a huge volume of near daily phone calls or text messages from the individuals who sold the pills to pressure them to place more orders for counterfeit pills. (Ind. ¶ 85).

### E. Holly Holderbaum Was Killed by the Enterprise's Fentanyl Pills

As described above, thousands of individuals purchased counterfeit pharmaceuticals from the Enterprise; at least nine of those victims later died from narcotics poisonings. (PSR ¶ 16).

As described above, on or about February 12, 2024, Holly placed an order from Curecog for anti-anxiety medication but, on or about February 13, 2024, emailed Gonzalez to request that her order be changed to "oxyxodone [sic]." (PSR ¶ 71). Holly did not have a prescription for oxycodone and neither Gonzalez nor the operators of Curecog requested one. (*Id*.).

On February 16, 2024, Lopez Reyes sent Eustate Jimenez a list of customer names, addresses, and pill orders for Eustate Jimenez to fulfil. (PSR ¶ 72). Included in the list was Holly's order: "oxy M30 90," shorthand for 90 tablets of 30-milligram oxycodone. (*Id*.). Seconds later, Lopez Reyes replied to his own message to Eustate Jimenez containing the customer order list and, in sum and substance, clarified, "These are almost all oxy." (*Id*.).

Also on February 16, 2024, less than a half hour after receiving Holly's order, Eustate Jimenez sent a photograph of Holly's order to Ramos Henriquez. (PSR ¶ 72). Ramos Henriquez and Marvin Polanco packaged the pills for shipment to Victim-1 using pills manufactured by Leo. (PSR ¶ 72; Tr. 2364:1-18, 2402:5-2403:11, 2407:7-2408:19 (Ramos Henriquez)). Indeed, Ramos Henriquez forwarded Eustate Jimenez the below photograph he received from Marvin Polanco, of fake 30-milligram oxycodone pills, with an "M" on one side and the number "30" on the other,

35

ready to be shipped, along with a USPS envelope addressed to Holly. (PSR ¶ 72; Tr. 2443:13-2445:4 (Ramos Henriquez)). Marvin Polanco subsequently shipped that package to Holly on February 16, 2024 from a post office in Lawrence, Massachusetts. (PSR ¶ 72).



On February 20, 2024, the Enterprise's package containing the purported oxycodone was delivered to Holly. (PSR ¶ 73). That same day, Holly searched the internet for indicia that the pills she had received were genuine pharmaceuticals. (*Id.*). For example, she entered into a search engine "pill" and "pill identifier." (*Id.*; GX 1009). She also visited a pill identification website and searched, "M 30 Blue and Round." (PSR ¶ 73; GX 1009). The results of Holly's internet search indicated that round, blue pills with an "M" on one side and "30" on the other are 30-milligram oxycodone pills; in other words, she was led to believe that the pills she had received were real prescription medication. (PSR ¶ 73; GX 1009).

Shortly after Holly received the Enterprise's pills in the mail, she became severely ill, vomited for several consecutive days, and was unable to urinate—common symptoms of fentanyl

poisoning.  (PSR ¶ 74).  On February 24, 2024, Holly sent a text message to her friend stating, in sum and substance, that she was using pain medications.  (*Id.*).  The following day, on February 25, 2024—five days after Holly received the defendants' pills—her mother found Holly unresponsive in bed.  (*Id.*).  Soon after, emergency services responded to Holly's home, and she was pronounced dead.  (*Id.*).

At Holly's bedside were 46 of the blue pills, depicted below, that the Enterprise designed to appear to be 30-milligram oxycodone tablets.  (PSR ¶ 75).  Despite what Holly thought she had found on the internet about the safety of those pills, testing revealed what only the defendants knew: the pills were actually made of fentanyl and para-fluorofentanyl.  (*Id.*).  Because Holly ingested the fentanyl and para-fluorofentanyl distributed by the Enterprise through their false websites, deadly pill mills, and lethal shipments, Holly died.  (*Id.*).  Her cause of death was acute fentanyl intoxication.  (*Id.*).

 

II.      **Relative Culpability**

    The defendants in this case can be grouped into four tiers of relative culpability:

- **Senior Leadership.**  The top tier with the most culpable defendants in this case is composed of the senior leadership of this vast narcotics conspiracy (the "Senior Leadership" tier).  The defendants in the Senior Leadership tier occupy positions of organizers, supervisory positions, or any other position of management with respect to at least five other members of the conspiracy, and they have obtained substantial income or resources from this narcotics enterprise.  Senior Leadership had direct visibility into many—if not all—aspects of this narcotics trafficking operation; gave specific instructions to their supervisees about how to manufacture the pills to look like real prescription drugs; ordered, facilitated, and/or benefitted from the laundering of narcotics proceeds; recruited and paid other members of the conspiracy; and continued their illegal conduct time and time again despite the arrests of their co-conspirators or the shutting down of certain pill mills.

- **Supervisors.**  The second most culpable tier of defendants in this case is composed of organizers, leaders, managers, or supervisors other than those involved in Senior Leadership (the "Supervisors" tier).  Defendants in the Supervisors tier directly supervised and occupied a position of authority over at least two other individuals and recruited other people to join the conspiracy, including their own family members.  Some of these defendants operated their own pill mill, and others ran their own pill shipping operation.

- **Pill Mill Operators.**  The third most culpable tier of defendants in this case are composed of the defendants who operated and worked at the pill mills manufacturing the pills in this case (the "Pill Mill Operators" tier).  The Pill Mill Operators were generally supervised by the Supervisors and by Senior Leadership.  Some Pill Mill Operators taught their co-conspirators how to manufacture narcotic pills, some personally manufactured narcotic pills, and some helped replace parts and repair broken pill press machines to ensure the operation could continue running smoothly.  Some Pill Mill Operators engaged in multiple of these activities.

- **Shippers & Facilitators.**  The least culpable tier of defendants is composed of those who worked for other members of this conspiracy to ship pills to victims and/or facilitate online orders through the acceptance of money and messages from victims (the "Shippers & Facilitators" tier).  Compared to their co-defendants, the Shippers & Facilitators had the least visibility into the vast scope of this narcotics conspiracy.

Although not comprehensive of the full scope of this massive Enterprise, the below organizational chart helps to illustrate some of the various leadership tiers within this organization.



To further aid the Court in assessing relative culpability, below are additional comparative metrics between the defendants in this case, which is based on currently available information.[2] Convicted defendants are arranged in the four relative culpability tables that correspond to the tiers

---

[2] Guidelines calculations below are based upon stipulations between the parties set forth in the respective plea agreements and reflected in final PSRs issued for the below defendants, where available. Where there is no plea agreement and there is not yet a PSR, those fields have been left blank. Once the Court determines the Guidelines for each defendant below, to the extent that calculation differs from the parties' stipulation, these tables will be updated in subsequent submissions. These tables will also be updated to reflect sentences imposed, and to reflect additional convictions, if any.

described above: (1) Senior Leadership, (2) Supervisors, (3) Pill Mill Operators, and (4) Shippers & Facilitators.  Within each tier, the defendants are further arranged in generally descending order of culpability.

**Senior Leadership**

| Defendant | Counts of Conviction | Offense Level | Criminal History Category | Guidelines Range | Man. Min. | Sentence Imposed |
|---|---|---|---|---|---|---|
| Francisco Alberto Lopez Reyes, a/k/a "Frank" | 1, 2, 3 (lesser-included § 841(b)(1)(C) distribution), 4 | | | | Life | |
| Juan Moises Perez Mendez, a/k/a "Caballero" | 2 | 47 (capped at 43) | II (2 points) | Life | 240 mo. | |

**Supervisors**

| Defendant | Counts of Conviction | Offense Level | Criminal History Category | Guidelines Range | Man. Min. | Sentence Imposed |
|---|---|---|---|---|---|---|
| Wellington Eustate Espinal, a/k/a "Roni" | 2 (lesser-included § 841(b)(1)(A) conspiracy) | 52 (capped at 43) | IV (9 points) | Life | 120 mo. | |
| Edward Eustate Jimenez, a/k/a "Chino" | 2, 3 (lesser-included § 841(b)(1)(C) distribution) | | | | 240 mo. | |

40

**Pill Mill Operators**[3]

| Defendant | Counts of Conviction | Offense Level | Criminal History Category | Guidelines Range | Man. Min. | Sentence Imposed |
|---|---|---|---|---|---|---|
| Hector Bienvenido Feliz Feliz, a/k/a "Tacoma" | 2 (lesser-included § 841(b)(1)(A) conspiracy) | 39 | I (0 points) | 262 to 327 mo. | 120 mo. | |

**Shippers & Facilitators**

| Defendant | Counts of Conviction | Offense Level | Criminal History Category | Guidelines Range | Man. Min. | Sentence Imposed |
|---|---|---|---|---|---|---|
| Wilianyi Almanzar Polanco | 2 (lesser-included § 841(b)(1)(B) conspiracy) | 31 | I (0 points) | 108 to 135 mo. | 60 mo. | |
| Alba Gonzalez | 2 (lesser-included § 841(b)(1)(C) conspiracy) | 31 | 1 (0 points) | 108 to 135 mo. | None | |

---

[3] Roberto Vargas Paulino and Cristian Eustate Espinal ("C. Eustate Espinal") are members of the Enterprise who worked under W. Eustate Espinal and H. Eustate Espinal at the Beaumont Pill Mill. Vargas Paulino and C. Eustate Espinal pleaded guilty in Case Number 23 Cr. 577 before Judge Liman prior to the filing of the S8 Superseding Indictment in this case, and as such, neither defendant was charged with participating in the conspiracy resulting in the death of Holly Holderbaum. *See United States v. Roberto Vargas Paulino and Cristian Eustate Espinal*, 23 Cr. 577 (LJL) (S.D.N.Y.) at Dkt. 84 (Vargas Paulino Judgment); Sept. 24, 2024 Minute Entry (C. Eustate Espinal Plea). Indeed, the conspiracy with which Vargas Paulino and C. Eustate Espinal were charged related exclusively to the Beaumont Pill Mill, and comprised only the time period of September 2023 through October 2023. *See id.* at Dkt. 17 (Indictment). They were also charged substantively in connection with the drugs seized from the Beaumont Pill Mill on October 5, 2023. *Id.* Both Vargas Paulino and C. Eustate Espinal pleaded guilty to participating in the lesser-included § 841(b)(1)(C) narcotics distribution conspiracy. *Id.* at Dkt. 84; Sept. 24, 2024 Minute Entry. Had they been included in the S8 Superseding Indictment, the Government would view them as the least-culpable of the defendants who are in the Pill Mill Operators tier. Judge Liman determined Vargas Paulino's Guidelines range to be 87 to 108 months based on an offense level of 29 and a criminal history category of I, and Judge Liman sentenced Vargas Paulino to 42 months' imprisonment. *Id.* at Dkt 84 at 2 (Judgment), 87 at 7 (Sentencing Transcript). C. Eustate Espinal has not yet been sentenced. The Guidelines stipulated to in C. Eustate Espinal's plea agreement are the same as those Judge Liman found applicable to Vargas Paulino.

41

### III.    Offense Conduct Specific to Wellington Eustate Espinal

W. Eustate Espinal, the defendant, falls into the very top of the Supervisors tier. (*See* PSR ¶ 85). He is the most culpable defendant in this case outside of the Senior Leadership tier, which includes only Lopez Reyes and Perez Mendez. As discussed above, the defendant and his brother, H. Eustate Espinal, ran the Beaumont Pill Mill, supervising Eustate Jimenez and at least two others, including their youngest brother Cristian Eustate Espinal, and Vargas Paulino, recruiting them into the conspiracy. (*Id.*). The Beaumont Pill Mill was hidden in a basement of a residential building in the Bronx, with its windows covered with black trash bags and dark fabric, to prevent outside observers from viewing the criminal activity occurring inside. The Beaumont Pill Mill was also equipped with a surveillance system that provided a real-time feed of the exterior of the property. The outside of the residential building housing the Beaumont Pill Mill is pictured below:



The defendant and H. Eustate Espinal procured multiple industrial grade pill presses, each capable of pressing tens of thousands of pills a day. (PSR ¶ 85). Some of the equipment found in the Beaumont Pill Mill, including pill presses and die molds for those pill press machines, is pictured below:





43

The defendant and his brother H. Eustate Espinal also hid pills and at least 12 bricks of narcotics inside of a fireplace-like piece of furniture that functioned as a "trap" or hidden compartment for drugs. Several bricks were marked with the label "1000% Pure," and at least one was marked with the label "fentanilo," the word for fentanyl in Spanish. The trap and bricks are pictured below.






The defendant and H. Eustate Espinal took great care to ensure that the pills manufactured at the Beaumont Pill Mill were as indistinguishable from real pharmaceuticals as possible, employing dyes and specialized pill molds. (PSR ¶ 85). Some of the dyes recovered from the Beaumont Pill Mill are pictured below:



As reflected in the organizational chart above, while the defendant and H. Eustate Espinal ran the Beaumont Pill Mill, they manufactured pills for Lopez Reyes first under the direction of Paulino, and then after Paulino's arrest, under the direction of Perez Mendez, ultimately manufacturing hundreds of thousands of pills that were shipped across the country to customers. For instance, with respect to Paulino, whenever a pill press machine broke down at the Wadsworth Pill Mill, Paulino went to the defendant and his brother H. Eustate Espinal—known as "the guys"—at the Beaumont Pill Mill and tasked them with making Lopez Reyes's pills. (Tr. 974:13-23 (Paulino)). Lopez Reyes told Paulino that the defendant and the others at the Beaumont Pill Mill made the pills "well" and "did good work." (Tr. 982:22-983:2 (Paulino)). Paulino was arrested in May 2023, but the defendant was undeterred and continued running the Beaumont Pill

Mill.  The defendant knew full well about Paulino's arrest; he even spoke to Paulino while Paulino was in jail.  (Tr. 1288:23-1289:11 (Paulino)).

Perez Mendez, for his part, enlisted the defendant and the Beaumont Pill Mill to manufacture Lopez Reyes's pills for him until he could set up his own secret basement pill mill to do the same.  (Tr. 1095:8-11 (Paulino)).   Among other things, for example, on Sunday, June 18, 2023, Perez Mendez told the defendant, "I need 50,000 M30's tomorrow."  (GX 31D, Line 18).  The defendant indicated he was missing a "thingy," presumably a part for a pill press machine, but that he could make these pills by Wednesday at the latest.  (GX 31D, Lines 20-23).  On July 20, 2023, Perez Mendez told the defendant that there are "some problems" because the "little blue sky . . . colors keep shifting"—presumably, a reference to the need for Lopez Reyes's blue M30 pills to be uniform in color; otherwise, the customers might realize there was something off and discover they were not, in fact, real oxycodone.  (*See* GX 31D, Line 42).  The defendant agreed to make whatever "he"—Lopez Reyes—wants, but said that Perez Mendez needed to provide a photo because the defendant was not going to keep dealing with all the "back and forth" and complaints about pills being "too dark" or "too light."  (GX 31D, Line 44).

The Beaumont Pill Mill had customers apart from Lopez Reyes and existed prior to the start of this Enterprise.  Indeed, in approximately September 2021, Lopez Reyes asked Paulino to source pills for him in the United States, and Paulino was able to get ecstasy, M30s, and Percocet from H. Eustate Espinal and the Beaumont Pill Mill, which was up and running before Paulino began regularly using the Beaumont Pill Mill as a source for Lopez Reyes's pills.  (*See* Tr. 1192:8-1193:6, 1196:7-1198:17 (Paulino)).  Running the Beaumont Pill Mill was the defendant's primary "occupation" and provided his livelihood for years.  (PSR ¶ 87).  Indeed, he spent long hours each day pressing pills at the mill.  (*Id*.).

46

On October 5, 2023, law enforcement seized 97,479 pills from the Beaumont Pill Mill. In total, the pills and powdered narcotics seized amounted to over 29 kilograms of fentanyl and nearly 14.5 kilograms of methamphetamine—nearly *one hundred pounds* of drugs just on the one day that the agents searched the mill. (GX 1007). Below is a photo of the drugs seized from the Beaumont Pill Mill.



The defendant was keenly aware that he was supplying victims with deadly narcotics. (PSR ¶ 86). On one occasion, the defendant became extremely sick after inhaling aerosolized narcotics while pressing pills and appeared to be overdosing before he was administered Narcan by a Beaumont Pill Mill worker. (*Id.*). The defendant was not deterred by his brush with death; instead, he and his fellow workers at the Beaumont Pill Mill took extra precautions, including by using industrial grade gas masks. (*Id.*). Several such masks were recovered from the Beaumont

Pill Mill and two are pictured below.  The defendant himself started a practice of drinking milk to induce vomiting if he began feeling unwell.  (PSR ¶ 164).







48



## V.  **Criminal History**

W. Eustate Espinal has the most extensive criminal history of any defendant in this case. The defendant with the next most extensive criminal history is Perez Mendez, and as set forth above, Perez Mendez has two criminal history points to W. Eustate Espinal's *nine*.

The defendant was first convicted of a federal narcotics distribution conspiracy at age 23 in 2005.  (PSR ¶ 139).  In the United States District Court for the District of New Jersey, the defendant was convicted of cocaine distribution conspiracy and was sentenced to 30 months'

imprisonment. (*Id.*). The defendant informed arresting agents that his role in the drug transaction was to provide protection. (*Id.*). Upon his release from prison in January 2008, the defendant was deported to the Dominican Republic. (*Id.*). The defendant illegally reentered the United States in December 2008. (PSR ¶ 153).

Four years later, at age 29, the defendant was arrested and subsequently convicted of a second narcotics trafficking offense, this time in New York. (PSR ¶ 140). Specifically, in New York County Supreme Court in 2012, the defendant was convicted of criminal possession of a controlled substance in the third degree for selling cocaine. (*Id.*). He was sentenced to a longer term of imprisonment than his first conviction: 42 months' imprisonment. (*Id.*). The defendant was granted parole in 2013 and was deported for at least the second time to the Dominican Republic. (*Id.*).

In 2017, at age 34, the defendant was convicted in the United States District Court for the District of Massachusetts of illegal reentry; he was sentenced to 46 months' imprisonment. (PSR ¶ 141). When the defendant was arrested in that case, police determined that his fingerprints appeared to have been surgically altered. (*Id.*). Upon his release from prison in March 2020, the defendant was deported to the Dominican Republic for at least the third time. (*Id.*).

By 2022 at the latest, the defendant was back in the United States, operating the Beaumont Pill Mill.

## VI.    The Plea and Guidelines Calculation

On October 6, 2023, the defendant was charged by Complaint in connection with his operation of the Beaumont Pill Mill. *See United States v. Wellington Eustate Espinal, et al.*, 23 Cr. 577 (LJL), at Dkt. 1. On November 6, 2023, the defendant was indicted in the same case before Judge Liman. *See id.* at Dkt. 17. On September 30, 2024, the defendant was charged in the S8 Superseding Indictment in this Court in case number 23 Cr. 501. Specifically, the defendant was

charged in Count Two with conspiracy to distribute narcotics resulting in the death of Holly Holderbaum, in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(A), and 841(b)(1)(B). (Ind. ¶¶ 105-108). On October 10, 2024, the defendant's original case before Judge Liman, 23 Cr. 577, was reassigned to this Court.

On December 12, 2025, pursuant to a plea agreement, the defendant pleaded guilty in this Court to the lesser-included offense of Count Two, conspiracy to distribute and possess with intent to distribute: (i) 100 grams and more of mixtures and substances containing a detectable amount of para-fluorofentanyl, an analogue of fentanyl; (ii) 400 grams and more of mixtures and substances containing a detectable amount of fentanyl; (iii) 500 grams and more of mixtures and substances containing a detectable amount of methamphetamine, its salts, isomers, and salts of its isomers; (iv) one kilogram and more of mixtures and substances containing a detectable amount of heroin; and (v) 500 grams and more of mixtures and substances containing a detectable amount of cocaine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A). (PSR ¶¶ 2-3).

In his plea agreement, the defendant further stipulated, pursuant to U.S.S.G. §§ 1B1.2(a) and/or 1B1.2(c), that in the course of the narcotics offense charged in Count Two of the Indictment, the defendant conspired to distribute and possess with intent to distribute mixtures and substances that contained para-fluorofentanyl and fentanyl, the use of which substances resulted in the death of Holly Holderbaum on or about February 25, 2024.

In that plea agreement, the Government agreed to move to dismiss any open counts against the defendant at the time of sentencing, including open counts in the indictment in *United States v. Wellington Eustate Espinal*, 23 Cr. 577 (JPC).

The defendant further stipulated in his plea agreement that the applicable Guidelines range is life imprisonment, with a mandatory minimum term of 120 months' imprisonment. This range

51

is based on Criminal History Category IV, derived from nine criminal history points, and an Offense Level of 52, which is capped at 43 under the Guidelines. The Offense Level includes, among other enhancements, a two-level increase pursuant to U.S.S.G. § 3C1.1, because the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation of the instant offense of conviction. As a result, the defendant did not receive an adjustment under U.S.S.G. § 3E1.1 for acceptance of responsibility.

The United States Probation Office reached the same Guidelines calculation in the PSR that the parties stipulated to in the plea agreement. (*See* PSR ¶¶ 127-137, 142-143). Probation recommends a sentence of 200 months' imprisonment. (PSR at 45).

## VII.    Victim Impact

For years, the Enterprise manufactured and shipped millions of counterfeit prescription pills filled with deadly narcotics including fentanyl, para-fluorofentanyl, and methamphetamine, to thousands of customers in all 50 U.S. states. Based on USPS shipping records and text messages between members of the Enterprise, including Lopez Reyes, Eustate Jimenez, M. Brito, and Onega, to date, the Government has identified over 2,500 unique victims of this vast scheme. This number undoubtedly severely underestimates the actual number of Americans who received the Enterprise's fake prescription drugs. The Government does not possess a comprehensive list of victims, including because (1) members of the Enterprise regularly changed cellphones and deleted their communications such that the communications the Government does have are almost certainly not inclusive of all communications and pill orders over the course of this conspiracy; (2) there are additional devices involved in this scheme that the Government did not search— including devices of Lopez Reyes, Ramos Henriquez, Marvin Polanco, and Leo, for instance; and (3) the Enterprise sold large quantities of pills to other drug dealers who in turn resold those pills to countless more victims.

52

It is impossible to capture the impact that this Enterprise had on everyone its pills reached. Lopez Reyes and his subordinates ran a multiyear operation with the sole purpose of making money while attempting to trick people into buying purported FDA-approved prescription medications actually manufactured with deadly narcotics. Between August 2023 and June 2024 alone, at least nine victims, all of whom had at least at one point purchased counterfeit prescription pills from the defendants, died from narcotics poisoning. (PSR ¶ 16). One such victim was Holly Holderbaum. The Government has enclosed victim impact statements from Holly's family members, as Exhibits A through F.

The Government has also enclosed a victim impact statement from the aunt of victim Brian Butler ("Brian"), as Exhibit G. Eustate Jimenez shipped counterfeit pills to Brian at least once, in February 2024, after Brian ordered them from one of the Enterprise's websites. Tragically, in May 2024, Brian took his own life using a firearm. Brian left a note for his family, alluding to the pills he had been purchasing from the Enterprise: "I have done something remarkably stupid, in an attempt to manage my migraines."[6]

## DISCUSSION

### I.     Applicable Law

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the Guidelines are not mandatory; however, it also held that a district court must "consult" the Guidelines and "take them into account" when fashioning a sentence. *Id.* at 264. As the Supreme Court has explained, "a district court should begin all sentencing proceedings by correctly

---

[6] The victim impact statement in Exhibit G makes reference to Brian having been "blackmailed and tormented" by drug dealers. The Government is not aware of anyone in the Enterprise engaging in blackmail of victims, and respectfully asks the Court to disregard this aspect of Exhibit G in considering an appropriate sentence.

calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After that calculation, a court must proceed to consider seven factors outlined in 18 U.S.C. § 3553(a): (i) "the nature and circumstances of the offense and the history and characteristics of the defendant," *id.* § 3553(a)(1); (ii) the four legitimate purposes of sentencing, *see id.* § 3553(a)(2); (iii) "the kinds of sentences available," *id.* § 3553(a)(3); (iv) the Guidelines range itself, *see id.* § 3553(a)(4); (v) any relevant policy statement by the United States Sentencing Commission, *see id.* § 3553(a)(5); (vi) "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and (vii) "the need to provide restitution to any victims," *id.* § 3553(a)(7).

In determining the appropriate sentence, the statute directs courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B)    to afford adequate deterrence to criminal conduct;
> (C)    to protect the public from further crimes of the defendant; and
> (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

*Id.* § 3553(a)(2).

## II.    The Court Should Impose a Sentence of At Least 600 Months' Imprisonment

The defendant managed a pill mill that flooded the country with millions of pills he knew were deadly. He is the most culpable defendant of the Supervisors within this Enterprise, with only Senior Leadership members Lopez Reyes and Perez Mendez more culpable than he. ██

████████████████████████████████████████████████

████████████████████████████████████████████ The

defendant is a career criminal: despite having served multiple prison sentences for drug trafficking crimes, he has not been deterred.  In light of all of this, a sentence of at least 600 months' imprisonment is sufficient, but not greater than necessary, to comply with the purposes of sentencing, namely, to reflect the seriousness of the offense and to provide just punishment—including for the immeasurable harm done to victims—to promote respect for the law, and to afford adequate deterrence to criminal conduct.

### A. The Seriousness of the Offense and the Need to Provide Just Punishment Warrant a Significant Sentence

The defendant played an integral role in a uniquely vast and deadly serious drug trafficking offense.  The seriousness of this offense—and of the defendant's role in particular—warrants a very significant sentence.  This Enterprise is magnitudes more sophisticated, far-reaching, and pernicious than the heartland of narcotics distribution cases that come before courts in this district. The staggering volume of seized narcotics, the sheer number of identified co-conspirators, the tragic reach of the Enterprise's drug distribution to Americans in every state in this country, and the trickery and deception employed by this Enterprise through their fraudulent online pharmacies sets this conduct entirely apart from the great majority of drug conspiracies, and the seriousness of this offense commands an equally serious sentence.

The drug seizures alone in this case are a telling metric of the severity of this crime. Between May 2023 and April 2024 alone, law enforcement officers seized 647,208 fake pills, which, when combined with the unpressed narcotic powders seized, amounts to 271 kilograms, or 597 pounds, of drugs.  (GX 1007).  This quantity is all the more significant because it is nowhere near the total amount of drugs manufactured and sold by this Enterprise.  These seizures are mere snapshots of a *single day's supply* at a given pill mill or stash location.  And even though the total drug quantities seized in this case do not come close to capturing the total amount of drugs

distributed by this Enterprise, they are nevertheless remarkable.  In 2024, the Drug Enforcement Administration ("DEA") seized 9,950 kilograms of fentanyl nationwide.  *See* https://www.dea.gov/sites/default/files/2025-07/2025NationalDrugThreatAssessment.pdf  at  21. In *this* case, in just under 11 months, the DEA seized from the Enterprise over 172 kilograms of fentanyl and para-fluorofentanyl, an analogue of fentanyl.  (GX 1007).  In other words, the Enterprise's supply of fentanyl and its analogues is equivalent to almost 1.75% of the DEA's fentanyl seizures *across the entire country* in one year.

This reality is all the more striking in context.  Defendants like W. Eustate Espinal were manufacturing tens of thousands of new pills on a daily basis—including the day of the search of the Beaumont Pill Mill, as evidenced by the blue powder and M30 pills found on two of the pill press machines in that mill.  The drugs found at the Beaumont Pill Mill, for instance, were simply the drugs the defendant had on hand the day he was caught.  Looking at the Beaumont Pill Mill alone is illustrative.  Congress determined that a ten-year mandatory minimum sentence was warranted for a defendant who participated in a conspiracy to distribute 400 grams or more of mixtures and substances containing fentanyl, or 500 grams or more of mixtures and substances containing methamphetamine.  *See* 21 U.S.C. § 841(b)(1)(A)(vi) and (viii).  On the date of his arrest at the Beaumont Pill Mill, this defendant was in possession of *over* 29 kilograms of fentanyl, and over 14 kilograms of meth.  (GX 1007).  That is *72.5 times* the minimum quantity of fentanyl, and 28 times the minimum quantity of methamphetamine, required to trigger the highest available mandatory minimum linked to drug weight.

The defendant is not just responsible for *possessing* with the intent to distribute drug quantities magnitudes greater than those triggering § 841(b)(1)(A) penalties.  He is responsible for owning and operating the pill mill where those drugs were pressed into nearly one hundred

thousand pills. (GX 1007). He and his brother H. Eustate Espinal are also responsible for recruiting at least three other people, including two of their family members, into the conspiracy: Eustate Jimenez (their cousin), C. Eustate Espinal (their youngest brother), and Vargas Paulino. The defendant's actions had an outsized effect—Eustate Jimenez in turn recruited several others into the conspiracy, including Ramos Henriquez and Leo, the manufacturer of the pills that killed Holly.

This crime is all the more serious, and the defendant is all the more deserving of a significant sentence, because this Enterprise's drug distribution resulted in the death of an unwitting victim, a U.S. Army veteran who appeared to genuinely believe she received legitimate oxycodone pills from an FDA-approved online pharmacy. Even though the defendant is not directly responsible for manufacturing the pills that killed Holly, he is responsible for participating in a conspiracy that did so, and he is responsible for manufacturing hundreds of thousands more, all of which he took care to make look real, just like Lopez Reyes wanted, and just like Paulino and Perez Mendez told him to do. The Beaumont Pill Mill was unique in one respect: it was the only pill mill in this case at which law enforcement found real oxycodone pills. Of the 97,479 pills recovered from the Beaumont Pill Mill, just two of them were genuine oxycodone, and a third was a mixture of oxycodone and acetaminophen. (*See* GX D-89A). Another four were genuine alprazolam, more commonly known as Xanax. (*Id.*). The defendant and his workers used these real oxycodone and Xanax pills as samples, to ensure that the fake, fentanyl-and-meth-filled counterfeits they made looked just like the real thing. (PSR ¶ 52). The defendant was careful to disguise his pills to look like genuine medications, and the defendant succeeded—at the expense of an untold number of victims.

57

The defendant knew his pills were deadly.  As discussed above, on one occasion, he nearly died while manufacturing pills and had to be revived using Narcan.  After his near-death experience, the defendant either did not reflect on the fact that pills he was manufacturing were poison or did not care.  Either way, the defendant's complete disregard for human life is evident.  He kept at it, manufacturing deadly pills just so that he could profit.  And while the Government has only proven one death—Holly's—resulted from the Enterprise's distribution of drugs, at least nine individuals who purchased drugs from the Enterprise later died.  The defendant personally manufactured millions of pills at the Beaumont Pill Mill.  There can be no doubt that these pills killed.

### B. The Need for Specific Deterrence and to Promote Respect for the Law Warrants a Significant Sentence

By his own admission, the defendant is a career criminal—he has worked almost his whole life in the "drug business."  (PSR ¶ 123).  The defendant incurred his first narcotics conviction over *twenty years ago*, and he has been undeterred since.  (*See* Def. Sub. 8 ("Wellington has been selling drugs for almost all of his adult life, a very long time, and his arrest history provides just a glimpse into the level of deprivation that he and all of his brothers have been involved in.")).  A very significant sentence—one that incapacitates the defendant and ensures that he is removed from society—is required for specific deterrence and to promote respect for the law.  There is no question that, once released from prison, the defendant will return to the United States and continue spreading his poison to victims.

He has done it his whole life.  The defendant has spent his career illegally entering the United States, committing drug crimes, getting deported, and coming back to commit more drug crimes.  He has served three terms of incarceration, two of which were for narcotics convictions, and he has been deported at least three times.  Time and time again, he returns, and he resumes his

illegal activity.  Most concerningly, he escalates.  Before this case, the defendant's convictions were related to the sale of cocaine in what appear to be street-level transactions.  (PSR ¶¶ 139-140).  By 2022, the defendant had upgraded to running a wholesale pill manufacturing operation, complete with several commercial grade pill press machines and an entire premises in which he and his workers could manufacture drugs day in and day out.  The defendant also escalated the dangerousness of the drugs he opted to sell.  Although he still had some cocaine in his pill mill, he primarily dealt with fentanyl and methamphetamine.  And while he "sporadically worked at his brother-in-law's deli" in years past, running the Beaumont Pill Mill with his brother H. Eustate Espinal was the defendant's entire livelihood.  (PSR ¶¶ 87, 169).  He worked long hours there each day, and his pill mill is how he financially supported himself.  (PSR ¶¶ 87, 169).

The defendant has demonstrated that he is undeterred by the possibility of additional convictions and prison sentences, he is undeterred by deportation, and most shockingly, he is undeterred by near death.  As discussed, while the defendant was running the Beaumont Pill Mill, he actually overdosed on fentanyl and was revived by Narcan administered by another pill mill worker.  (PSR ¶¶ 86, 164).  *This did not stop him from manufacturing at least another 97,000 deadly pills*.  By the defendant's own telling, after he almost died from the poison he was peddling, he simply "consumed milk to induct vomiting if he began feeling unwell."  (PSR ¶ 164).  The defendant had no regard whatsoever for the people who would go on to consume the pills that he almost died while making.  It is difficult to overstate the callousness of this conduct.

### C.    The Need for General Deterrence Warrants a Significant Sentence

Two aspects of the defendant's conduct demand a significant sentence to further the sentencing goal of legitimate deterrence: (1) his role in the offense itself, ███████████████ ███████████████ .

Fentanyl and other synthetic opioids are the most common drugs involved in overdose deaths, and on average, over 150 people die per day from such poisonings. *See* https://www.cdc.gov/overdose-resources/pdf/CDC_Fentanyl-Fact-Sheet_General_508.pdf. The distribution of staggering quantities of fentanyl, without more, warrants a significant sentence to further the goal of general deterrence. But the distribution of fentanyl disguised as a legitimate prescription pharmaceutical is exponentially more dangerous and nefarious conduct, and there is a critical public safety need for general deterrence of a crime of this nature. It is one thing to sell a drug as deadly as fentanyl. It is another thing entirely to disguise it as something else, something safer. Holly's death and her actions immediately before demonstrate exactly why the defendant's conduct, and the conduct of the other members of this Enterprise, is so menacing. Holly placed an order for oxycodone. Less than 20 minutes after receiving the Enterprise's pills, Holly searched the internet for the pills she received, in a clear effort to confirm that they were safe and that she had received what she had ordered. She searched for "M 30" "blue" and "round," and below is a screenshot of the website Holly visited. (*See* GX 938).



The first search result told Holly that the blue M30 pills she received were oxycodone. (GX 938). With that assurance, Holly took the pills she received, and then she died. The knowing and intentional misrepresentation of deadly fentanyl pills as anything but, is conduct that society cannot tolerate and conduct that clearly requires a significant sentence to send a message to others who wish to likewise dupe their customers to rake in profits with zero regard for the tragic and irreversible consequences of their actions. Deterrence of this nature is critical to preventing countless other avoidable deaths in this district and across the country.



62





**D.    A Significant Sentence Will Avoid Unwarranted Sentencing Disparities**

The Government does not lightly seek a sentence of 600 months.  Sentences of that magnitude are extraordinary and should be reserved for the most culpable actors in the most serious

of crimes.  The defendant is that actor.  He is the third most culpable defendant in this case, after

Lopez Reyes and Perez Mendez.  His offense conduct alone warrants a decades-long sentence, █

███████████████████████████████████████████████████.  A sentence of 600 months

is commensurate with the defendant's own conduct, but it is also commensurate with his relative

culpability in this case, and his relative culpability when compared to other significant narcotics

traffickers in this district.

With respect to this case, the defendant is the first to be sentenced.  But the mandatory

minimum sentences that must be imposed upon his co-defendants, some of whom are more

culpable than he, and some of whom are less, are an instructive metric that the Court can and

should consider in fashioning an appropriate sentence.  Specifically, Lopez Reyes is undoubtedly

the most culpable person in this case.  He led the Enterprise for years, and for his role, a jury

convicted him of being a principal leader of this continuing criminal enterprise.  As a result, he

faces a mandatory life sentence.  Eustate Jimenez, by contrast, falls into the Supervisor culpability

tier, just like the defendant, and he faces a mandatory minimum sentence of 20 years for his role

in the conspiracy that distributed pills resulting in Holly's death.  Eustate Jimenez's role in this

Enterprise was extensive and devastating, but he is plainly not as culpable as the defendant.  Unlike

Eustate Jimenez, the defendant: (1) is in his 40s, has an extensive criminal history, and has sold

drugs for nearly his entire adult life; (2) ran and operated his own pill mill in which he personally

manufactured millions of pills made of fentanyl and methamphetamine; (3) almost died from

working with these dangerous drugs but kept doing it anyway; (4) recruited his cousin Eustate

Jimenez and his own youngest brother into the conspiracy; and ████████████████████

████████████████████████████████████████████████████████████████

████.  The defendant plainly deserves a substantially more significant sentence than Eustate

64

Jimenez—and Eustate Jimenez cannot be sentenced to less than 20 years.  A 600-month sentence is appropriately squarely within the respective culpability of Lopez Reyes, the defendant, and Eustate Jimenez.

This comparison alone demonstrates how inapplicable the Probation Office's 200-month sentencing recommendation and how extreme the variance sought by the defendant—who seeks a 120-to-160-month sentence—truly are.  Put simply, the defendant should not receive a lesser sentence than Eustate Jimenez, his young cousin whom he recruited into the conspiracy and who began his own destructive criminal career by working for the defendant at the Beaumont Pill Mill. Probation points to the defendant's guilty plea to a "non-violent criminal charge," his lack of any disciplinary infractions at the MDC, and his "cooperative and forthcoming" nature during his presentence interview as mitigating factors.  (PSR at 46).  They are not.  That the defendant has followed the rules he is required to follow in jail plainly does not warrant a variance here, especially not one so staggeringly below the life guidelines range. █████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████ And the facts of this case make abundantly clear the "absurdity" of the claim that this drug crime is non-violent.  *See Harmelin v. Michigan*, 501 U.S. 957, 960 (1991) (Kennedy, J. concurring) ("Possession, use, and distribution of illegal drugs represent one of the greatest problems affecting the health and welfare of our population. . . . Petitioner's suggestion that his crime was nonviolent and victimless . . . is false to the point of absurdity.") (internal quotations and citations omitted).

For his part, despite the fact that he stipulated in his plea agreement that he was a "leader or organizer" in this conspiracy and is not contesting the applicability of that Guideline, the defendant now seeks to minimize his role by baselessly claiming that he is "more of a Pill Mill

65

operator in tier 3 than he is a supervisor . . . in tier 2," and that he was simply a "longtime employee" of the Beaumont Pill Mill  (Def. Sub. 12).  This is false.  The defendant and his brother H. Eustate Espinal were partners in running the Beaumont Pill Mill.  It was their operation, their manufacturing site, and their piece of this Enterprise.  Law enforcement referred to the defendant's pill pressing outpost as the "Beaumont Pill Mill."  To members of this conspiracy, it was just known as "Roni and Daulin's place."  (Tr. 974:13-23 (Paulino)).  The Beaumont Pill Mill was in existence even before Paulino came to the United States at Lopez Reyes's behest.  There is no question that the defendant ran the Beaumont Pill Mill, recruited employees to work for him, and kept the Beaumont Pill Mill in operation for over a year and a half.



The defendant's attempts to minimize his own conduct even on the eve of sentencing demonstrates his lack of remorse and acceptance of responsibility, and his abject failure to understand the seriousness of the offense and consequences of his actions.  This, too, weighs in favor of a substantial term of incarceration.

The 600-month sentence the Government seeks is also commensurate with other significant narcotics trafficking sentences in this district. In *United States v. Sica*, 676 Fed. App'x 81 (2d Cir. 2017), the Second Circuit affirmed Judge Seibel's 420-month sentence of a defendant who engaged in a conspiracy to traffic heroin and fentanyl that resulted in the deaths of three people. Unlike W. Eustate Espinal, the defendant in *Sica* was "not a high-level drug dealer," "was an addict himself," ███████████████████████. *Id.* at 87. W. Eustate Espinal was a leader and supervisor in this conspiracy, he recruited others to join in his criminal activity, he ran his own large-scall pill pressing operation, ████████████████████████████████ ████████████████████. W. Eustate Espinal is deserving of a significantly lengthier sentence than the defendant in *Sica*.

*United States v. Luis Osvalda Espinal Paulino, a/k/a "Yayo,"* 24 Cr. 240 (DLC) (S.D.N.Y.) is another helpful comparator. Like the defendant, Yayo ran and operated a prolific pill mill in New York City. *Id.*, Dkt. 65 (Yayo Sentencing Transcript), at 6. Indeed, Yayo knew and sold drugs with members of this Enterprise. (*See* Tr. 1168:13-20 (Paulino)). On the date Yayo's pill mill was searched by law enforcement, police recovered approximately 50,000 pills containing methamphetamine and 11 kilograms of raw methamphetamine. *See* 24 Cr. 240 (DLC), Dkt. 65 at 6. Judge Cote sentenced Yayo principally to 240 months' imprisonment, citing the "massive scale" of his pill mill, the "great harm" it inflicted on the community, and the need for general deterrence, among other factors. *Id.* at 16-17. Yayo is far less culpable than the defendant. Yayo's Guidelines were 262 to 327 months' imprisonment—not life. *See id.* at 3. The drug types and quantities alone in Yayo's pill mill versus the defendant's underscore how much worse the defendant's conduct was than Yayo's. For Yayo's 50,000 pill-stock in a single day, the defendant had over 97,000. *Id.* at 6. For Yayo's multi-kilogram stash of methamphetamine, the defendant

67

had methamphetamine plus *29 kilograms of fentanyl*—an exponentially more dangerous and deadly drug than methamphetamine.  Yayo had no fentanyl whatsoever.  Unlike the defendant, Yayo (1) was not responsible for participating in a conspiracy whose drugs killed someone, (2) did not participate in a conspiracy of this magnitude, which sold its drugs to victims in all 50 states; (3) did not disguise his drugs as prescription medications, (4) did not almost die and continue working, ████████████████████.  *See* 24 Cr. 240 (DLC), Dkt. 62 (Government Sentencing Submission).  The 240-month sentence Yayo received underscores just how much worse the defendant's conduct was, and how much greater of a sentence he should receive by comparison.

Other defendants in significant narcotics trafficking cases in this circuit—but who are markedly less culpable than W. Eustate Espinal—have received similarly substantial sentences. *See, e.g.*, *United States v. Wyche and Allen*, 18 Cr. 561 (DLI) (Sept. 2024), Dkt. 265, 266, 286, 288 (480-month and 360-month sentences imposed on defendants who participated in a § 841(b)(1)(C) narcotics conspiracy resulting in death and serious bodily injury, involving only "multiple glassine envelopes" of narcotics, and involving no counterfeit pharmaceuticals ████ ████████████ ); *United States v.  United States v. Wang*, 23 Cr. 302 (PGG) (S.D.N.Y. Sept. 19, 2025) (leader of organization convicted of participating in fentanyl precursor importation conspiracy—involving no deaths, no counterfeit pharmaceuticals, █████████████████████— sentenced to 25 years' imprisonment).  By comparison, a 600-month sentence for the defendant would not create unwarranted sentencing disparities and is entirely appropriate given the many aggravating factors applicable in this case.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should impose a sentence of at least 600 months' imprisonment, a sentence that would be sufficient, but not greater than necessary, to achieve the legitimate purposes of sentencing.

Dated: New York, New York
       June 10, 2026

Respectfully submitted,

JAY CLAYTON
United States Attorney
Southern District of New York

By: _____
Katherine Cheng
Maggie Lynaugh
Chelsea L. Scism
Adam Sowlati
Assistant United States Attorneys
212-637-2105

69